# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| TERESA M. ARNETT, SHARLEEN PELZL, JAMES O. SMITH, AND RPOA TEXAS OUTREACH, INC., | |
| Plaintiffs, | |
| | Case No. 1:12-CV-913-LY |
| v. | |
| FRANK DENTON, Chairman of Commissioners of the Texas Department of Licensing and Regulation, in his official capacity and STATE OF TEXAS, | |
| Defendants. | |

### *AMICI CURIAE* BRIEF OF THE HUMANE SOCIETY OF THE UNITED STATES AND THE TEXAS HUMANE LEGISLATION NETWORK ON THE LEGAL ISSUES RAISED BY PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

**HUNTON & WILLIAMS LLP**

Michael S. Held
Texas Bar No. 09388150
Jesse T. Moore
Texas Bar No. 24056001
111 Congress Ave., Suite 510
Austin, TX 78701
Telephone:  512-542-5053
Facsimile:  512-542-5049
Email:  mheld@hunton.com
        jtmoore@hunton.com

*Attorneys for the Humane Society of the United States and the Texas Humane Legislation Network*

# TABLE OF CONTENTS

Page

Background ................................................................................................................1

    I.      History of this Case................................................................................1

    II.     Interests of the Amici..............................................................................2

    III.    The Act....................................................................................................3

Background ................................................................................................................5

    I.      General Legal Standards for a Preliminary Injunction Request .............5

    II.     Likelihood that Plaintiff Will Prevail on the Merits ..............................6

           (a)     Equal Protection Challenge.........................................................6

           (b)     Vagueness Challenge ................................................................11

           (c)     Unreasonable Search & Seizure Challenge ..............................15

           (d)     Due Process Challenge .............................................................20

    III.    Threat that Plaintiff will Suffer Irreparable Injury if Preliminary Injunction is not Granted..............................................................................................22

    IV.    Balance of Threat to Plaintiff versus Harm to Defendant.....................23

    V.     Effect of Injunction upon Public Interest..............................................24

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*American Canine Found. v. City of Aurora,*
    618 F.Supp.2d 1271 (D. Colo. 2009) ........................................................9

*Beal v. Stern,*
    184 F.3d 117 (2d Cir. 1999) .................................................................22

*Canal Auth. of State of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) .......................................................5, 6, 23

*El Paso Apartment Ass'n v. City of El Paso,*
    415 Fed.Appx. 574 (5th Cir. 2011) .........................................................8

*Fischer v. City of St. Louis,*
    194 U.S. 361 (1904) ...............................................................................9

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .............................................................................13

*Greater Chicago Combine & Ctr., Inc. v. City of Chicago,*
    431 F.3d 1065 (7th Cir. 2005) ..............................................................10

*Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston,*
    660 F.3d 235 (5th Cir. 2011) ............................................................7, 10

*Haviland v. Butz,*
    543 F.2d 169 (D.C. Cir. 1976) ..............................................................11

*Heller v. Doe,*
    509 U.S. 312 (1993) ...............................................................................8

*House of Tobacco, Inc. v. Calvert,*
    394 S.W.2d 654 (Tex. 1965) .................................................................21

*Humane Soc. of U.S. v. Gutierrez,*
    527 F.3d 788 (9th Cir. 2008) ................................................................23

*Kerr v. Kimmell,*
    740 F.Supp. 1525 (D. Kan. 1990) ...........................................................9

*Lesser v. Espy,*
    34 F.3d 1301 (7th Cir. 1994) ................................................................20

*M.L.B. v. S.L.J.*,
  519 U.S. 102 (1996)...................................................................................................21

*Monk v. Huston*,
  340 F.3d 279 (5th Cir. 2003) ...................................................................................21

*Morgan v. Fletcher*,
  518 F.2d 236 (5th Cir. 1975) ...................................................................................22

*Nat'l Meat Ass'n v. Brown*,
  599 F.3d 1093 (9th Cir. 2010), *rev'd on other grounds* 132 S.Ct. 965 (2012).......................23

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977).................................................................................................24

*New York City Friends of Ferrets v. City of New York*,
  876 F.Supp. 529 (S.D.N.Y. 1995)............................................................................11

*New York v. Burger*,
  482 U.S. 691 (1987)......................................................................................... passim

*Nichols v. Alcatel USA, Inc.*,
  532 F.3d 364 (5th Cir. 2008) ...................................................................................22

*Omaechevarria v. State of Idaho*,
  246 U.S. 343 (1918)..................................................................................................9

*Prof'l Dog Breeders Advisory Council, Inc. v. Wolff*,
  No. 1:09-cv-258-SHR, 2009 WL 2948527 (M.D. Pa. Sept. 11, 2009) ..........................3, 9, 17

*Rinaldi v. Yeager*,
  384 U.S. 305 (1996).................................................................................................21

*Spiegel v. City of Houston*,
  636 F.2d 997 (5th Cir. 1981) ...................................................................................22

*State v. Gaines*,
  580 N.E.2d 1158 ......................................................................................................10

*Tex. Democratic Party v. Benkiser*,
  459 F.3d 582 (5th Cir. 2006) ...................................................................................24

*Tex. Med. Providers Performing Abortion Svcs. v. Lakey*,
  667 F.3d 570 (5th Cir. 2012) ...............................................................................13, 15

*United States v. Clark*,
  582 F.3d 607 (5th Cir. 2009) ...............................................................................12, 13

*United States v. Castelo*,
    415 F.3d 407 (5th Cir. 2005) ...................................................17, 19

*United States v. Fort*,
    248 F.3d 475 (5th Cir. 2001) ...................................................17, 19

*Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n*,
    259 F.2d 921 (1958)................................................................22

*Valeria G. v. Wilson*,
    12 F.Supp.2d 1007 (N.D. Cal. 1998) .......................................24

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)...............................................................12

*Weinberger v. Romero–Barcelo*,
    456 U.S. 305 (1982)...............................................................24

## STATUTES

Animal Welfare Act of 1966, Pub. L. No. 89-544, 80 Stat. 350, U.S.C. §§ 2131-2159 ...............18

TEX. OCC. CODE § 51.354 ..............................................................20

TEX. OCC. CODE § 802 .......................................................... passim

Texas Dog or Cat Breeders Act, 82d Leg., R.S., ch. 1284, § 1, 2011 Tex. Gen. Laws 3583..........1

## OTHER AUTHORITIES

16 TEX. ADMIN. CODE §§ 91.23(a)(4) & 91.24(a)(4) (2012)........................................14

Rule 65 of the Federal Rules of Civil Procedure ...................................5

Licensing & Administrative Procedures, *C.S.H.B. 1451—Bill Analysis* at 1 (Tex. 2011),
    *available at* www.legis.state.tx.us/tlodocs/82R/analysis/pdf/HB01451H.pdf. ........................3

Texas Constitution ...................................................................1, 11

United States Constitution ...................................................... passim

Wright & Miller, Federal Practice & Procedure: Civil § 2947......................................5

Wright & Miller, Federal Practice & Procedure: Civil § 2948......................................6

TO THE HONORABLE JAMES R. NOWLIN, UNITED STATES DISTRICT JUDGE:

The Humane Society of the United States and the Texas Humane Legislation Network (the "***Amici***") hereby file this Brief, which addresses the legal issues raised or implicated by the *Motion for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction* filed by Plaintiffs in this lawsuit on October 5, 2012 at Docket No. 5 (the "***TRO Motion***").[1]

## BACKGROUND

### I.     History of this Case

Plaintiffs in this lawsuit allege that the Texas Dog or Cat Breeders Act, 82d Leg., R.S., ch. 1284, § 1, 2011 Tex. Gen. Laws 3583, codified at TEX. OCC. CODE § 802.001 *et seq.* (the "***Act***") and various regulations promulgated thereunder (the "***Rules***") by the Texas Commission of Licensing and Regulation (the "***Commission***") as enforced by the Texas Department of Licensing and Regulation (collectively with the Commission, "***TDLR***") violate various provisions of the United States Constitution and the Texas Constitution. *Second Amended Complaint* at ¶¶ 22-29, filed October 31, 2012, Docket No. 10 (the "***Complaint***").[2]

Broadly speaking, the Act and the Rules provide for "the creation of a regulatory scheme on the breeders of certain dogs and cats within the State of Texas." *Id*. at ¶ 11.  The Texas Legislature passed the Act and the Governor of Texas signed it in 2011. The TDLR then approved the Rules in March 2012.  *Id*. at ¶ 13.  The Act and the Rules thereunder went into effect on September 1, 2012.  *Id*. at ¶ 11.

---

[1] Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction, *Arnett v. Denton*, No. 1:12-cv-913-JRN (W.D. Tex. Oct. 5, 2012).
[2] Plaintiffs' Second Amended Complaint for Declaratory Relief at ¶¶ 22-29, *Arnett v. Denton*, No. 1:12-cv-913-JRN (W.D. Tex. Oct. 31, 2012).

One month after the Act and the Rules went into effect, this lawsuit was commenced.[3] Shortly after commencing this lawsuit, Plaintiffs filed the TRO Motion, which requests that the Court issue orders enjoining the State of Texas and the TDLR from "taking any action to enforce either the Act or the Rules" prior to a full trial on the merits. *TRO Motion* at ¶ 13. No such trial has been scheduled. On November 1, 2012, the Defendants filed a motion to dismiss the lawsuit and an objection to the TRO Motion, at Docket Nos. 11 and 13, respectively.[4]

## II.    Interests of the Amici

The Texas Humane Legislation Network ("THLN") is a statewide organization that was established in 1975. Since that time, THLN's volunteers have been devoted to promoting the enactment and enforcement of laws to protect animals from neglect and abuse in the State of Texas. In the 2011 regular session of the Texas Legislature, THLN was actively involved if not instrumental in the drafting of the Texas Dog or Cat Breeders Act as well as advocating for its passage through its thousands of members throughout the state.

The Humane Society of the United States ("HSUS") was established in 1954 and is the largest animal protection organization in the country, with over 11 million members and supporters. HSUS's mission is to protect animals through legislation, litigation, investigation, education, science, advocacy, and field work. HSUS has been at the forefront of efforts to improve conditions for animals in breeding facilities, both in Texas and throughout the country. HSUS also devotes investigative resources to exposing the cruelty involved in certain aspects of

---

[3] *See* Plaintiff's [sic] Original Complaint for Declaratory Relief and Request for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction, *Arnett v. Denton*, No. 1:12-cv-913-JRN (W.D. Tex. Oct. 1, 2012).
[4] Defendants' Motion to Dismiss, *Arnett v. Denton*, No. 1:12-cv-913-JRN (W.D. Tex. Nov. 1, 2012); Defendants' Response to Motion for Preliminary Injunction, *Arnett v. Denton*, No. 1:12-cv-913-LY (W.D. Tex. Oct. 1, 2012).

dog and cat breeding, and works with law enforcement to prosecute cases of cruelty to animals in such facilities.

HSUS has served as *amicus curiae* in other cases involving challenges to animal protection legislation, including cases challenging laws regulating commercial breeding facilities. For example, after Pennsylvania passed a law in 2008 requiring improved standards for dogs in breeding facilities, breeders challenged the law on grounds not unlike those raised by Plaintiffs here. *See Prof'l Dog Breeders Advisory Council, Inc. v. Wolff*, No. 1:09-cv-258-SHR, 2009 WL 2948527 (M.D. Pa. Sept. 11, 2009). The court upheld all key aspects of the statute. *Id.*

## III.  The Act

A broad description of the Act's purposes and provisions may be helpful. The legislative sponsors of the Act were concerned that commercial breeding facilities often "do not provide adequate and humane care for the animals they are breeding, many times failing to keep animals properly sheltered or to provide adequate veterinary attention."[5] Indeed, prior to the enactment of the Act, there was "little to no regulation requiring these facilities to provide a minimum standard of care for these animals."[6]

The Act simply requires "the licensing and regulation of dog and cat breeders," and does not "prohibit[] or hinder[] the breeding or the selling of dogs and cats."[7] The Act defines "dog or cat breeder" as

> a person who possesses 11 or more adult intact female animals and is engaged in the business of breeding those animals for direct or indirect sale or for exchange in return for consideration and who sells or exchanges, or offers to sell or exchange, not fewer than 20 animals in a calendar year.

---

[5] House Committee on Licensing & Administrative Procedures, *C.S.H.B. 1451—Bill Analysis* at 1 (Tex. 2011), *available at* www.legis.state.tx.us/tlodocs/82R/analysis/pdf/HB01451H.pdf.
[6] *Id.*
[7] *Id.*

TEX. OCC. CODE § 802.002(8). "Intact" females are unspayed and capable of reproduction. *Id.* § 802.002(11).

The breeding of dogs for racing or hunting or agricultural purposes is generally exempt from the Act. *Id.* §§ 802.003 & 802.005. Further, a person who does have 11 or more unspayed females and is engaged in the breeding business can avoid regulation by rebutting the presumption that the females are used for breeding purposes. *Id.* § 802.004.

The Act authorizes the Commission to promulgate the Rules under the Act and calls for the TDLR to enforce the Act and the Rules. *Id.* § 802.051. The TDLR can charge fees to licensed breeders and hire personnel and pay for other expenses needed to enforce theAct. *Id.* §§ 802.052-054. The TDLR collects and in some instances disseminates information on licensees, inspectors, and consumer information. *Id.* §§ 802.055-058. The TDLR must inspect licensed breeding facilities once every 18 months and investigate reported violations, and may contract with third-party inspectors to do so. *Id.* §§ 802.060-063.[8]

Dog and cat breeders must be licensed after an application and inspection process. *Id.* §§ 802.101-104. License holders can renew their license, and the TDLR may revoke or suspend a license. *Id.* §§ 802.106-107. Licensees must maintain records. *Id.* §§ 802.153-154. They must also conform to the standards of care adopted by the Commission with the assistance of an advisory board, which is comprised of a diverse group of interested citizens. *Id.* §§ 802.065 & 802.201.

The Act also sets a floor for basic standards of care. Licensees must comply with federal regulations promulgated pursuant to the federal Animal Welfare Act. *Id.* § 802.201(b)(1). Dogs must be provided with regular exercise. *Id.* § 802.201(b)(2). Licensees cannot breed animals too

---

[8] It does not appear that the TDLR has contracted with any third-party inspectors.

frequently, and must ensure that their animals are groomed and that their facilities are sanitary. *Id*. § 802.201(b)(3)-(4). Cages must be safe and clean, and can no longer be stacked more than three high, or stacked in any fashion that permits animal waste to drip from cage to cage. *Id*. § 802.201(b)(5)-(7). Regular veterinary examinations are required, as are preventative care measures, and only veterinarians can euthanize animals. *Id*. § 802.201(b)(8)-(11). Breeders and their employees must be trained and cannot sell animals that are less than eight weeks old. *Id*. § 802.201(b)(12)-(13).

The TDLR may issue its standard administrative penalties to enforce the Act and the Rules. *Id*. § 802.251.

### Legal Briefing

The Amici first address the general legal standards applicable to Plaintiff's request for pre-trial relief, and then discuss in detail the particular legal challenges raised by Plaintiffs in their TRO Motion.

## I. General Legal Standards for a Preliminary Injunction Request

Rule 65 of the Federal Rules of Civil Procedure permits the Court to enter a preliminary injunction or temporary restraining order. The Fifth Circuit has established clear rules governing a request for such pre-trial relief. "[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

> Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary injunction application, the most compelling reason in favor of (granting a preliminary injunction) is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act.

*Id*. at 573 (quoting Wright & Miller, Federal Practice & Procedure: Civil § 2947).  "Thus only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction."  *Id*.

The four prerequisites for obtaining a preliminary injunction are:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Id*. at 573.  The "extraordinary remedy" of a preliminary injunction is "not available unless the plaintiff carries his burden of persuasion as to all of the four prerequisites."  *Id*. at 576.

## II.     Likelihood that Plaintiff Will Prevail on the Merits

In considering the preliminary injunction request, the Court should balance the merits of Plaintiffs' case against the hardships threatened to Plaintiff.

> Although a showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be by its grant does not remove the need to show some probability of winning on the merits, it does lower the standard that must be met. Conversely, if there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that he is likely to prevail on the merits is particularly important.

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d at 576 (citing Wright & Miller, Federal Practice & Procedure: Civil § 2948).

Here, Plaintiffs challenge the Act and the Rules on equal protection, vagueness, due process, and unlawful search and seizure grounds.  The Amici discuss the law that may apply to each of these challenges below.

### (a)     Equal Protection Challenge

Plaintiffs' equal protection challenge argues

Sections 802.003 and 802.005 of the Act violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in that breeders of

dogs and cats intended to be used for certain purposes are treated differently than other breeders of dogs and cats without a rational basis for such a distinction.

*Complaint*, ¶ 24.

The Act exempts certain breeders from its ambit, including breeders of dogs for racing purposes as well as persons who, "for personal use" only, breed dogs

> with the intent that [they] be primarily used for
> (1) herding livestock, as defined by Section 1.003, Agriculture Code, or other agricultural uses;
> (2) hunting, including tracking, chasing, pointing, flushing, or retrieving game; or
> (3) competing in field trials, hunting tests, or similar organized performance events.

TEX. OCC. CODE § 802.005(a).

Based on these exemptions, Plaintiffs contend that, by distinguishing between dog breeders based on the purpose for which the dogs are bred, the Act violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, which states that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

Plaintiffs are incorrect. As long as there is no protected class at issue, the State is entitled to make distinctions based on different categories of persons provided the State has a "rational basis" for doing so, as Plaintiffs correctly note. *Complaint*, ¶ 24. In the context of a similar equal protection challenge, the Fifth Circuit recently applied this rational-basis test and explained it as follows:

> Under this standard, a legislative classification will be upheld if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Because all legislation classifies its objects, differential treatment is justified by any reasonably conceivable state of facts. Legislation need not pursue its permissible goal by using the least restrictive means of classification; consequently, the Equal Protection Clause is not violated merely because the classifications made are imperfect.

*Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 239 (5th Cir. 2011).

The challenging party bears a heavy burden for showing that there is no rational basis for a legislative classification.

> "[A] classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," and the burden is on the challenger to "negative every conceivable basis which might support [the classification]."

*El Paso Apartment Ass'n v. City of El Paso,* 415 Fed.Appx. 574, *3 (5th Cir. 2011) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

There are many conceivable bases for distinguishing between animals bred for racing or for personal use for hunting or agricultural purposes, versus animals raised for other purposes such as the pet trade. For example, the legislature may have reasonably believed that individuals breeding dogs for their own use are likely already to have incentives to provide humane living conditions for their breeding dogs and their offspring, to ensure the health and welfare of animals that will remain in their care as opposed to being sold into a distant home. Alternatively, the legislature could have decided that the economic benefits derived from animals raised for working purposes outweighs concerns for their welfare. On the other hand, social, moral, and safety considerations may require stricter restrictions upon those who breed for use as pets and companions—the legislature could decide that measures need to be taken to ensure the proper and humane breeding and raising of dogs who will be in homes, in urban areas, or otherwise in close proximity to the public, including children and the elderly.

Similarly, dogs raised and sold for the pet trade may rationally be subjected to increased regulation because they are more likely to be sold to uneducated consumers who would be less likely to know the proper questions to ask of breeders about the conditions wherein the dogs

were raised, whereas consumers buying hunting dogs may, as a group, be more educated about breeding and raising animals. Negating these readily identifiable rational bases, along with every other conceivable rational basis for distinguishing between pet dogs and working dogs, is a high hurdle for Plaintiffs' equal protection challenge to clear.

Numerous courts have rejected equal protection challenges to laws that distinguish between various species or types of animals, including the United States Supreme Court. The Court has upheld the right of a municipality to discriminate in issuing licenses to urban dairy farmers:

> We have no criticism to make of the principle of granting a license to one and denying it to another, and are bound to assume that the discrimination is made in the interest of the public, and upon conditions applying to the health and comfort of the neighborhood.

*Fischer v. City of St. Louis*, 194 U.S. 361, 371 (1904). The Court also rejected a challenge to a law that discriminated between sheep owners and cattle owners:

> And it is not an arbitrary discrimination to give preference to cattle owners in prior occupancy without providing for a like preference to sheep owners in prior occupancy. For experience shows that sheep do not require protection against encroachment by cattle, and that cattle rangers are not likely to encroach upon ranges previously occupied by sheep herders. The propriety of treating sheep differently than cattle has been generally recognized.

*Omaechevarria v. State of Idaho*, 246 U.S. 343, 347-48 (1918).

Many other court decisions have upheld laws that discriminate between different types or uses of animals. *See, e.g., Prof'l Dog Breeders Advisory Council v. Wolff*, No. 1:CV–09–0258, 2009 WL 2948527, at *13 (M.D.Pa. Sept. 11, 2009) ("The state has a legitimate interest in protecting domestic animals, and the [kennel regulation] statute in question is rationally related to this objective."); *American Canine Found. v. City of Aurora*, 618 F.Supp.2d 1271, 1279 (D. Colo. 2009) ("I further conclude that the classification of pit bulls and restricted breeds in

Aurora's ordinance [regulating such breeds] is rationally related to its undisputed legitimate interest in protecting the health and safety of its residents."); *Kerr v. Kimmell*, 740 F.Supp. 1525, 1530 (D. Kan. 1990) ("Given the considerable deference accorded to state legislative decisions under the rational basis test promulgated by the Supreme Court, this court cannot say that the decision of the Kansas Legislature to separately regulate greyhound breeds and all other breeds of dogs is without a rational basis."); *State v. Gaines*, 580 N.E.2d 1158. 1162 (Ohio App. Ct. 1990) (finding that Ohio law making dog fighting a felony while other animal fighting is only a misdemeanor does not violate Ohio constitution because "this is a matter of legislative discretion").

Moreover, the question of whether the breeders of racing dogs, or the breeders hunting and agricultural dogs for personal use, ought to be regulated has no bearing on the question of whether existing pet breeder regulations are constitutional. "[T]he Equal Protection Clause is not violated merely because the classifications made are imperfect." *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d at 239. As the Seventh Circuit explained in rejecting an equal-protection challenge to a law regulating urban pigeon coops:

> It is true that other animals make noise, leave droppings, and can be otherwise unsavory. Nonetheless, without delving into the distinctions between pigeons and dogs, for instance, we can put this issue to rest by simply acknowledging that a city's decision to address a problem gradually is rational.

*Greater Chicago Combine & Ctr., Inc. v. City of Chicago*, 431 F.3d 1065, 1072 (7th Cir. 2005). Similarly, in rejecting a challenge to an act that regulated circus animals but excluded rodeo animals, the D.C. Circuit Court of Appeals stated:

> It is constitutionally unimportant that Congress has not seen fit to regulate all interstate transportation, purchasing or selling of animals in one fell swoop. As the evolution of the Animal Welfare Act manifests, Congress has chosen a cautious approach to regulation in this area, increasing governmental intervention as the national interest seemed to warrant. As the House Committee on

Agriculture put it, the Animal Welfare Act represents a continuing commitment by Congress to the ethic of kindness to dumb animals. From the small beginning in 1966 confined to a few animals, and only when they were devoted to research purposes the present legislation further, though still modestly, implement(s) a statutory mandate that small helpless creatures deserve the care and protection of a strong and enlightened public. We perceive nothing in the Constitution outlawing this commendable effort to demonstrate America's humanity to lesser creatures.

*Haviland v. Butz*, 543 F.2d 169, 177 (D.C. Cir. 1976) (internal citations and quotations omitted).

Federal courts have even applied this principal to ferret regulations:

That the City has chosen, in the field of ownership of animals, to regulate ferrets and not pit bull terriers, simply embodies the permissible exercise of its discretion to address evils in the same field which may be of different dimensions and proportions, requiring different remedies.

* * *

The City may select one phase of one field and apply a remedy there, neglecting the others.

*New York City Friends of Ferrets v. City of New York*, 876 F.Supp. 529, 540-41 (S.D.N.Y. 1995). For the same reasons, the Texas legislature may regulate those who commercially breed dogs and cats for pets while leaving other types of breeders unregulated without violating the Constitution.

**(b)    Vagueness Challenge**

"Plaintiffs contend that Sections 802.004 and 802.005 of the Act and Rule numbers 91.23 and 91.24 are unconstitutionally vague" and therefore violate their due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the Constitution of the State of Texas." *Complaint*, ¶ 15.

Courts apply different standards to vagueness claims depending on the arguments raised. Vagueness challenges such as Plaintiffs' that do not implicate specific rights, such as First Amendment rights, are less likely to succeed. Similarly, facial vagueness challenges such as

Plaintiff's that focus on hypothetical situations where ambiguity could be a problem, as opposed to real circumstances in which statutory language could not be applied without ambiguity, are also unlikely to succeed. As the Supreme Court has explained,

> [v]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness. The rationale is evident: to sustain such a challenge, the complainant must prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982). (internal citations and quotations omitted).

If a law "implicates no constitutionally protected conduct," then the court "should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009) (quoting *Hoffman*, 582 F.3d at 613) (emphasis added).

> Objections to vagueness under the Due Process Clause rest on the lack of notice and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. On the other hand, an ordinance is vague in all its applications where it subjects the exercise of a right to an unascertainable standard, or if, in other words, men of common intelligence must necessarily guess at its meaning.

*Id*. at 613 (internal citations and quotations omitted) (emphasis added).

> The degree of vagueness that the Constitution tolerates depends in part on the nature of the enactment, with greater tolerance for statutes imposing civil penalties and those tempered by *scienter* requirements.

> As we are condemned to the use of words, we can never expect mathematical certainty from our language. Our analysis therefore cannot focus upon the marginal cases in which an ordinarily plain statutory command can nonetheless yield some mote of uncertainty. Speculation about possible vagueness in hypothetical situations not before the court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications. We

must remember the elementary rule that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.

*Tex. Med. Providers Performing Abortion Svcs. v. Lakey*, 667 F.3d 570, 580-81 (5th Cir. 2012).

In other words, vagueness is more tolerated in the context of non-penal statutes that do not infringe upon fundamental rights, vagueness does not exist merely because one can speculate about hypothetical situations where a statute could be vague, and statutes should be reasonably construed in a way to avoid a vague interpretation, if possible.

Plaintiffs first challenge § 802.004 of the Act as vague. This states:

> For purposes of this chapter, each adult intact female animal possessed by a person engaged in the business of breeding animals for direct or indirect sale or for exchange in return for consideration is presumed to be used for breeding purposes unless the person establishes to the satisfaction of the department, based on the person's breeding records or other evidence reasonably acceptable to the department, that the animal is not used for breeding.

TEX. OCC. CODE § 802.004. Plaintiffs argue that this provision is vague because it "sets no standards for overcoming this presumption and simply leaves it in the hands of the department to make its own judgment." *Complaint*, ¶ 16.

In other words, Plaintiffs argue that Act's terms "breeding animals for direct or indirect sale," "reasonably acceptable" and "satisfaction" are so vague that "men of common intelligence must necessarily guess" at the meaning of these terms. *U.S. v. Clark*, 582 F.3d at 613. To prevail Plaintiffs must show that the Act's vagueness "impermissibly delegates basic policy matters to [the TDLR] for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Establishing facial vagueness goes beyond merely showing that the TDLR could apply the Act in an unreasonable or arbitrary manner—instead, Plaintiffs must show that these actual words in the Act are so vague that they will necessarily cause TDLR to act unreasonably

and arbitrarily. For example, Plaintiffs must show that the term "reasonably" in the Act is so vague that this term itself creates an unacceptable risk that the TDLR will act in an unreasonable and capricious manner.

Plaintiffs next argue that § 802.005 "does not specify whether it is the intent of the breeder or the end purchaser of the dog that controls the analysis," *Complaint*, ¶ 16. This logic is difficult to follow. It is not clear how breeders could be confused about their own personal, subjective intent at the time they themselves are raising animals based on what some future purchaser may eventually do with the animals.

Plaintiffs also argue that the use of the terms "other agricultural uses" and "similar organized performance events" are ambiguous. *Complaint*, ¶ 16. The Act uses these terms when exempting certain dogs raised for "personal use" from the Act:

> (1) herding livestock, as defined by Section 1.003, Agriculture Code, <u>or other agricultural uses</u>;
> (2) hunting, including tracking, chasing, pointing, flushing, or retrieving game; or
> (3) competing in field trials, hunting tests, <u>or similar organized performance events</u>.

TEX. OCC. CODE § 802.005(a) (emphasis added). For Plaintiffs' facial vagueness challenge to these underlined words to succeed, Plaintiffs must show that these terms themselves create a danger of "arbitrary and capricious application" by the TDLR. It is difficult to grasp the vagueness in these terms. Men of common intelligence are not forced to guess at the meaning of the terms "agricultural," "hunting," and "organized performance events" such as "field trials" and "hunting tests."

Plaintiffs finally challenge §§ 91.23 and 91.124 of the Rules as vague. *Complaint*, ¶ 19. These Rules state, in relevant part, that new and renewing breeder license applicants must "successfully pass a criminal background check." 16 TEX. ADMIN. CODE §§ 91.23(a)(4) &

91.24(a)(4) (2012) (Tex. Dept. of Licensing & Regulation, Dog or Cat Breeders Program).

Plaintiffs argue

> [i]n Section 91.23 and 91.24 of the Rules, the eligibility to obtain a Dog or Cat Breeders license requires, in part; the successful completion of a criminal background check. Unfortunately, the Rules do not specify what constitutes successful completion. Nothing in the Rules provides an applicant with any idea of whether the applicant can have no criminal history, only class C misdemeanors, successfully completed deferred adjudication, etc. and still pass this check.

*Complaint*, ¶ 20.

Yet the Act itself appears to dictate when a criminal history should cause the denial of an application:

> (a) The department shall deny issuance of a license to, or refuse to renew the license of, a person if the person or a controlling person if the dog or cat breeder has pled guilty to, been convicted of, or received deferred adjudication for animal cruelty or neglect in this state or any other jurisdiction in the five years preceding the person's initial or renewal application for a license.
>
> (b) The department shall revoke a license if, after the license is issued, the person or a controlling person of the dog or cat breeder pleads guilty to, is convicted of, or receives deferred adjudication for animal cruelty or neglect in this state or any other jurisdiction.

TEX. OCC. CODE § 802.107.

The Court can interpret these provisions in a non-vague way by simply applying "the elementary rule that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Tex. Med. Providers Performing Abortion Svcs. v. Lakey*, 667 F.3d at 581. In light of these criminal-history provisions of the Act, the Rules are not vague.

### (c)     Unreasonable Search & Seizure Challenge

Plaintiffs allege that "[§] 802.062 of the Act violates the right of Plaintiffs . . . to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution." *Complaint*, ¶ 25. Plaintiffs do not specify what particular aspects of § 802.062 fall afoul of the Constitution.

Section 802.062 of the Act states, in full:

(a) The department shall inspect each facility of a licensed breeder at least once in every 18-month period and at other times as necessary to ensure compliance with this chapter and rules adopted under this chapter.

(b) The inspection must be conducted during the facility's normal business hours, and the licensed breeder or a representative of the licensed breeder must be given a reasonable opportunity to be present during the inspection.

(c) If necessary to adequately perform the inspection, the department or third-party inspector may determine it is appropriate to not provide advance notice to the licensed breeder or a representative of the licensed breeder before arriving at the facility. The licensed breeder or its representative shall, on request of an inspector, assist the inspector in performing the inspection.

(d) In conducting an inspection under this section, an inspector may not enter or access any portion of a private residence of a licensed breeder except as necessary to access animals or other property relevant to the care of the animals. The inspector may request that relevant documents or records be provided for inspection.

(e) The inspector shall submit an inspection report to the department not later than the 10th day after the date of the inspection on a form prescribed by the department and provide a copy of the report to the licensed breeder or its representative.

Tex. Occ. Code § 802.062.

A search must be "unreasonable" to violate the Fourth Amendment. U.S. Const. amend.

IV. The Supreme Court and the Fifth Circuit have thoroughly developed their jurisprudence on the reasonableness of regulatory inspections.

Because the owner or operator of commercial premises in a closely regulated industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context. Rather, we conclude that, as in other situations of special need, where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.

*New York v. Burger*, 482 U.S. 691, 702 (1987).

Under *Burger* a warrantless search of a pervasively regulated business is permitted if: (1) there is a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the inspection is necessary to further the regulatory scheme; and (3) the statutory or regulatory scheme provides a constitutionally adequate substitute for a warrant.

*United States v. Castelo*, 415 F.3d 407, 409-10 (5th Cir. 2005) (citing *Burger*, 482 U.S. at 702-03).

The threshold issue is whether commercial breeding of dogs and cats for use as pets is a "pervasively regulated business." The existence of "extensive" regulations for an industry renders applicable *Burger*'s exception permitting warrantless searches. *United States v. Fort*, 248 F.3d 475, 480 (5th Cir. 2001). The state regulations at issue in *Burger* were found to be "extensive," because, among other things, the licenses were mandatory, license holders were required to maintain extensive records, license holders were required to display their license, and civil fines and criminal penalties were available for persons who violated these regulations. *Burger*, 482 U.S. at 704.

The commercial pet breeder industry in Texas likewise is pervasively regulated. The Act itself is extensive—it mandates licenses, imposes considerable record-keeping requirements, and provides for civil and criminal penalties for violators. *See supra* pgs. 3-5. *See also Prof'l Dog Breeders Advisory Council, Inc. v. Wolff*, 2009 WL 2948527 at *9 (rejecting breeders' Fourth Amendment challenge to Pennsylvania law regulating dog breeders and noting, among other things, that "by Plaintiffs' own contention, the industry is heavily regulated, hence the reason for this suit" and that "Plaintiffs cannot successfully argue that the kennel industry is not pervasively regulated while at the same time maintaining that the kennel industry is *too* pervasively regulated"). Further, the relatively short duration of the Act does not prevent it from being deemed "pervasive." The regulatory scheme at issue in *Burger* was also new, but the Court noted that both the auto industry and the junk industry had been regulated for decades, meaning

that auto junkyard operators had reduced expectations of privacy.  *Burger*, 482 U.S. 691 at 707.

Similarly, here there have been federal regulations and licensing requirements for commercial

dog and cat dealers since 1966.   *See* Animal Welfare Act of 1966, Pub. L. No. 89-544, 80 Stat.

350 (codified as amended at 7 U.S.C. §§ 2131-2159).

The Act's regulatory inspection scheme satisfies the three prongs of *Burger*.  In *Burger*,

the first prong was met because the state's interest in preventing theft informed the junkyard

regulatory scheme.  *Burger*, 482 U.S. at 708-09.  Here, the State of Texas has an interest in both

(a) protecting the welfare of the dogs and cats, and (b) ensuring that pet dogs and cats, which will

be sold to customers in distant locations and brought into residential neighborhoods and homes,

near children and the elderly, have been raised in a proper manner that protects public health and

safety.  These interests inform the Act and its inspection provisions.

Second, the inspections provided for by the Act are necessary to further its purposes.  The

Act does provide that inspections may be conducted without advance notice "if necessary,"

provided that (a) the license holder be given a "reasonable opportunity" to be present during the

inspection and (b) the inspection "may not enter or access any portion of a private residence of a

licensed breeder except as necessary to access animals or other property relevant to the care of

the animals."   TEX. OCC. CODE § 802.062(b)-(d).  *Burger* notes that surprise inspections are

often necessary because "surprise is crucial if the regulatory scheme aimed at remedying this

major social problem is to function at all" and cites many of Supreme Court precedents on this

issue.  *Burger*, 482 U.S. 691 at 710.

The third prong of *Burger* requires the Act to offer a constitutionally adequate substitute

for a warrant.  In *Burger*, the lack of enforcement officials' discretion regarding inspections and

the limits on the "time, place, and scope" of the inspections were deemed adequate.  *Id*. at 711-

12. The Fifth Circuit has characterized *Burger* as requiring an inspection program to "1) advise the owner of the commercial premises that the search is being made pursuant to law; and 2) limit the discretion of the inspecting officers." *U.S. v. Fort*, 248 F.3d at 482. Thus, a statute that limited inspections to commercial motor carriers at "reasonable time[s]" passed muster. *Id*. Similarly, a statute that limits inspections to commercial vehicles located on state highways likewise adequately limits the discretion of the inspecting officers. *U.S. v. Castelo*, 415 F.3d 407, 411 (5th Cir. 2005).

The Act has similar limits. Breeders are advised that the search is being made pursuant to law—along with their obvious knowledge of the Act and its licensing regime, breeders "must be given a reasonable opportunity to be present during the inspection" and provided with a copy of the inspection report shortly after the inspection. TEX. OCC. CODE § 802.062(b) & (e). The discretion of inspectors is limited under the Act—they are required to do inspections on a periodic basis during normal business hours. *Id*. § § 802.062(a)-(b). They are limited in the scope and place of their inspection. *Id*. § 802.062(c). They are required to make a written report of their inspection to the TDLR and to the breeder. *Id*. § 802.062(b) & (e). And, needless to say, these inspection rights only apply to persons who own a large number of unspayed female animals and engage in commercial dog or cat breeding.

Finally, it should be noted that the Plaintiffs again face the problem of asserting facial instead of as-applied challenges. If the Plaintiffs could show an actual pattern of abusive searches, their claims would not be as weak. As the Seventh Circuit explained in upholding a warrantless search of a rabbit breeding facility under the Animal Welfare Act,

> [w]hile a uniform number of inspections conducted in the due course of the regulatory scheme may be tolerated without a warrant, once an individual begins to receive distinctive treatment without apparent justification (such as more inspections than the regular schedule would indicate) oversight such as that

provided by the warrant process may be required to assure that the inspected's Fourth Amendment guarantees are met.

*Lesser v. Espy*, 34 F.3d 1301, 1309 (7th Cir. 1994) (citing *Burger*, 482 U.S. at 700-02). Here, however, Plaintiffs have not alleged that they have suffered any "distinctive treatment." The fear that the TDLR may act unreasonably in conducting inspections under Act does not mean that the Act is unconstitutional.

**(d)      Due Process Challenge**

As with their unreasonable search and seizure claim, Plaintiffs' due process claim is also vague. "Plaintiffs contend that Rule number 91.27 is unconstitutional as it deprives Plaintiffs and RPOA's membership of their property rights without due process guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution." *Complaint*, ¶ 26. More specifically, Plaintiffs state "Section 91.27 of the Rules controls the denial of an application for a license," but complain that "nothing in this section or anywhere else in the Rules provides for the opportunity to appeal this denial." *Id.* ¶ 20.

Chapters 51 of the Texas Occupations Code governs the procedures for challenging a denial or revocation of a Texas occupational license, including a dog or cat breeder's license under the Act. Plaintiffs have the right to an administrative hearing. Tex. Occ. Code § 51.354. Plaintiffs have not shown how these procedures actually failed to provide them with due process or resulted in an unjust deprivation—this is instead another facial challenge. This fact that this is a facial challenge in itself likely prevents the Plaintiffs from prevailing:

> The constitutional right to due process is not, however, an abstract right to hearings conducted according to fair procedural rules. Rather, it is the right not to be deprived of life, liberty, or property without such procedural protections.

> Even assuming plaintiffs have identified constitutionally protected property interests that would be harmed by approval of the permit application, they have not suffered any deprivation, because the [Texas administrative] permitting process has not yet run its course. The application may or may not be granted, and

thus plaintiffs may or may not be harmed. Therefore, until the [Texas administrative agency] issues the permit, this dispute remains "abstract and hypothetical" and thus unripe for judicial review.

*Monk v. Huston*, 340 F.3d 279, 282-83 (5th Cir. 2003).

Indeed, the Court should not conclude that the Act and the Rules do not provide due process without evidence of an actual failure to provide due process under the Act and the Rules:

We further agree that although this statute does not provide for notice and a hearing, that such is not unconstitutional since these provisions may be by implication incorporated into the statute unless the statute expressly provides otherwise, which it does not.

*House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 658 (Tex. 1965). Texas courts are cognizant of the need for due process in administrative hearings under both the United States and Texas Constitutions. Indeed, Plaintiffs can have those courts intervene in and cure any failure to provide adequate process in an administrative proceeding. *See, e.g., City of Corpus Christi v. Public Utility Comm,n of Texas*, 51 S.W.3d 231, 262 (Tex. 2001) (reviewing due process afforded in administrative proceeding).

Finally, it should be noted that Plaintiffs' sole argument that these hearing procedures fail to afford due process because they do not provide an opportunity to appeal a denial of a license is based on an incorrect assumption that such appeal rights are mandatory. "[D]ue process does not independently require that the State provide a right to appeal." *M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996). *See also Rinaldi v. Yeager*, 384 U.S. 305, 310-11 (1996) (stating that, even in criminal cases, "[t]his Court has never held that the States are required to establish avenues of appellate review").

### III. Threat that Plaintiff will Suffer Irreparable Injury if Preliminary Injunction is not Granted

Along with showing a substantial likelihood of success on the merits, Plaintiffs must also establish that they are presently "under a substantial threat of harm which cannot be undone through monetary remedies." *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981).

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weights heavily against a claim of irreparable harm.

*Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) (*quoting Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n*, 259 F.2d 921, 925 (1958)).

Showing irreparable injury based on conjectural, facial challenges to a law is problematic. Where, as here, Plaintiffs have not identified actual circumstances in which they have suffered from an unconstitutional taking, an unconstitutional search and seizure, or any other tangible deprivation of their rights, it does not seem possible for them to show any injury, much less an irreparable injury. This certainly weighs against granting the preliminary injunction. *See, e.g., Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 378-79 (5th Cir. 2008) (affirming denial of pre-trial injunction in retiree insurance benefits case because there was no evidence that any members of putative class of plaintiffs were "currently uninsured or unable to pay for coverage" and no evidence "that suggests these retirees could not continue their current coverage until a judgment is rendered in this lawsuit").

Moreover, the facial nature of Plaintiff's challenges may increase the weight that the Court should place upon the merits of this case when determining whether a preliminary injunction should be issued. *See, e.g., Beal v. Stern*, 184 F.3d 117, 123-24 (2d Cir. 1999) ("[I]n the context of this facial challenge, the presence of irreparable injury turns on whether the

plaintiff has shown a clear likelihood of success on the merits."); *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("[I]f there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that he is likely to prevail on the merits is particularly important.").  As discussed above, there is no likelihood of success on the merits of Plaintiffs' facial challenges, which also weighs against any finding of irreparable harm.

## IV.    Balance of Threat to Plaintiff versus Harm to Defendant

The "balancing of the hardships" element of the test for issuing a pre-trial injunction obviously will be informed by the irreparable injury element—a plaintiff who cannot show any imminent irreparable injury will rarely be able to show that "that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant."  *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d at 576.

Balanced against whatever tangible harms Plaintiffs actually face under the Act and the Rules are the interests of the State of Texas and its citizens in enforcing these laws and protecting animal welfare and safety as intended.  Protecting animal safety and welfare are factors that courts consider when balancing the harms in the context of a pre-trial injunction request. *See, e.g., Nat'l Meat Ass'n v. Brown*, 599 F.3d 1093, 1101 (9th Cir. 2010), *rev'd on other grounds* 132 S.Ct. 965 (2012) (vacating injunction against law governing slaughterhouses because balance of equities weighed in favor of defendants' interests in the humane handling of animals);  *Humane Soc. of U.S. v. Gutierrez*, 527 F.3d 788, 790 (9th Cir. 2008) (granting preliminary injunction against taking of sea lions based on threatened injury to interests of appellant animal rights organizations).  The animals living in commercial breeding facilities will be in danger of suffering in inhumane conditions if the law is even temporarily enjoined.

## V.     Effect of Injunction upon Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 213 (1982).

It is usually safe to assume that the public has an interest in enforcing the laws that the public itself enacted.   "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977).  *See also Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 595 (5th Cir. 2006) (stating "[i]t is beyond dispute that the injunction serves the public interest in that it enforces the correct and constitutional application of Texas's duly-enacted election laws."); *Valeria G. v. Wilson*, 12 F.Supp.2d 1007, 1027 (N.D. Cal. 1998) (finding that consideration of the public interest weighed against injunction that would ban enforcement of statute that "was enacted directly by the voters of the state").  Thus, in most instances, public interest will weigh against the issuance of a pre-trial injunction against the enforcement of duly-enacted laws, such as the Act and the Rules.

Respectfully submitted January 25, 2013.

**HUNTON & WILLIAMS LLP**

/s/  *Jesse T. Moore*
Michael S. Held, Texas Bar No. 09388150
Jesse T. Moore, Texas Bar No. 24056001
111 Congress Ave., Suite 510
Austin, TX 78701
Telephone:  512-542-5053
Facsimile:  512-542-5049
Email:   mheld@hunton.com
           jtmoore@hunton.com

*Attorneys for the Humane Society of the United
States and the Texas Humane Legislation Network*

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following, and that I also caused a copy of the foregoing to be served on the following via U.S. Mail first class, postage pre-paid:

Steven Thornton
WESTERBURG & THORNTON, P.C.
6060 N. Central Expressway, Ste. 690
Dallas, Texas 75206
*Attorney for Plaintiffs*

Erika M. Kane
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
*Attorney for Defendants*

/s/  *Jesse T. Moore*
Jesse T. Moore